Good morning, your honors. I'm Kent Keller on behalf of Data Control Corporation and the other defendants below. I want to discuss four issues with you, if permitted. First, the history of how we got where we got, briefly. Second, that the first application to Admiral is irrelevant for the issue of rescission. Third, that the second Admiral application will not support rescission. And fourth, an issue of latches. Okay, if you could please keep your voice up. I will do it. Okay, thank you. Starting with the first argument, we understand that for rescission based on concealment, you do not need intent. However, cases are very different if a party clearly intended to conceal information or if the party did not. And in this case, in 2000, Data Control Corporation, DCC, decided to purchase EPLI Insurance after having incurred two claims in 1998 that alleged sexual harassment. They went to Lloyd's of London and in the first application, clearly disclosed the existence of the 1998 litigation. And Lloyd's of London, after the disclosure, issued an EPL policy. Next year, as renewal rolled around, they went back to Lloyd's. This time, the application asked only, are there any claims of which underwriters or underwriters' representatives are not aware? And the answer is, of course, no, because in the previous application, they had described the Hanyata, the Atkinson, the Whittle litigation. And so, Lloyd's once again issued a policy. And then we come to the third year, and DCC goes back to Lloyd's again. And this time, they get a different application. This application asked for the, quote, lost history five years for all wrongful termination, discrimination, and sexual harassment claims, to which they answered none, and in which Admiral insists, well, that answer is clearly wrong. But there are two problems with Admiral's position. First of all, they're back at Lloyd's, and the underwriters or underwriters' representatives at Lloyd's are aware of the 1998 litigation. And secondly. Mr. Keller, maybe I missed this, and I know Lloyd's is kind of a consortium. Is Admiral part of the pool at Lloyd's? Admiral is not part of the pool. The third application gets relevant because it's picked up by Sweatt & Crawford and initially given to Admiral. So the first thing they get is the third application. To succeed on your argument, we need to find that the intermediary broker essentially was aware of this information and its knowledge must be imputed to Admiral. Well, that's one way, but not the only way. Okay. Well, let me go back to it. Before we get to that question, let me go back to the one I was trying to get to, which is if Admiral is a completely new insurer, then what difference does it make what the insured previously told Lloyd's? The difference is in two ways, I think. First, Admiral, through its company, Monitor, got this third application, and they claim that the third application started them down the wrong path, believing that when they read it that there had been no claims. I understand, but I'm assuming that Lloyd's did not share with Admiral all the information that it had on the insurer. We for sure don't know, but I make the same assumption. I mean, there's nothing on the record. So help me again. Maybe I'm missing a subtle part of your argument here, but I don't understand if the insured tells insurer A something, and eventually insurer A decides to no longer insure the risk, and so the insured goes to insurer B, what difference does it make what the insured told A? Well, in the way you state it, none. The only relevance is that Admiral has claimed that it relied on the third application to Lloyd's. Because when it issued its original binder in December 13, 2002, it didn't have an application. The only thing it had was the third Lloyd's application, and it insists that it deceived them. And the point is... But the binder merely says, we bind, but send us the application. That is correct. The binder, in theory, was only going to bind to January 27. It was going to expire. It didn't happen that way, but that's what the binder said. So the binder's not really yet the contract of insurance. It's independent upon the subsequent application where these questions are asked. That is, you are classically correct in that first year, it gets interesting when you issue a binder and you don't issue a policy until September 3rd of the following year. What was happening between January 27th and September 3rd? Was there any insurance? If you go with the classic view, there was none. The binder expired. There was nothing. There had to be insurance. So we can't go too far. You say there had to be insurance. Why do you say there had to be insurance? I would think that even Admiral would have had a hard time trying to deny that there was no insurance because their binder expired and they hadn't acted, and they left the insured in the lurch. They said, we'll issue a binder. They hadn't acted. They hadn't pressed the company to come forward with the application, which the company did in February. Nothing happens. Nothing happens. The company inquires in June, where's our policy? What's going on? And having done nothing, Admiral then the next day, June 11th, comes back and says, oh, you didn't answer that question about question number six, change in management. Tell us about that. So the company answers that. They get the answer, and again they do nothing for 49 days after they get the answer. They finally issue the policy. I'm not sure what difference any of this makes. As I understand Admiral's position, the insurance contract is void ad initio if material misrepresentations were made in procuring the insurance. So whether we would agree with you as a matter of technical contract law, offer acceptance contract, that the insurance coverage began at the moment the binder was issued, that still doesn't preclude the insurance company from rescinding the contract if it later discovers that material misrepresentations were made to procure it, does it? I don't disagree, and I apologize for running wild with the question. Let me move to the argument accepted by the district court was that the first policy was relevant to rescission, that Admiral could rescind not only the 2002-2003 policy, but the subsequent policy, 2003-2004. The litigation that prompts the rescission is in the second policy. It is filed in May of 2004. The reason why the first policy is irrelevant is two reasons. The district court relied on the Wallace case. When you read the Wallace case, it relies on the Solomon case, Solomon v. Federal Insurance, 176, Cal 133, 1917. What Solomon says is that the original application is relevant when it is reused for a second policy. That's not the case here. There were two applications. Let me talk what I think is sort of a straightforward and commonsensical reading. We've got two different applications or two different policies. The second policy falls outside the five-year period. That's correct. If we're talking about when the commencement of that 98 litigation is. On the other hand, the questions asked in that second policy are fairly broad, and I understand. I mean, I read the brief. You're trying to get out from under the broad language saying it's nonsensical knowledge of and so on. Yet I see nowhere where Admiral is told by the would-be insured of these two 1998 litigations, either in the application for the first policy, the 2002, or the second one. That is correct. And so I don't see where your client can say, listen, we answered the questions honestly. They knew what they were insuring. I think they had no idea what they were insuring. If the first application is irrelevant because a second application is used, and therefore the Wallace case is inapplicable, then you would look only at the second year. Bear in mind, if you apply the domino theory, first application is relevant. Suppose the Atkinson action were filed in 2012. Under that theory, you rescind all those policies. You go all the way back to square one. It doesn't matter that ten years has gone by and there have been no claims because, says the district court, you didn't tell them the truth in that first application. And that's a nonsensical result. Why is that nonsensical if the basis for the underwriting of the risk has to be the claims experience of the insured? And the underwriter would like to know from day one what the risk is of insuring this particular insured. I do a lot of insurance work. In insurance companies, very commonly, things finally wear off. Sins of the past go away. Five years is a typical period. That's good for the soul. We don't have any confession. Well, you did have confession. We just got mixed up when Sweatt and Crawford jumped in the game and got them the Admiral policy for less money. But it's common to have a wear off period such that you do not have to report claims that have happened in whatever a particular insurance company says is the distant past. In this case, Admiral says five years. And on the second application, more than five years have passed. Now, let me ask you this. There were two claims of discrimination or harassment in 98. How long did it take to settle those claims? One of the claims stuck around until I believe 2001. So the phrase involved in, which was one of the questions asked in the second insurance policy, well, I think it sounds like they were involved in because it hadn't been settled. The actual language. The other one, Judge Fletcher, was not settled until 1999. So there are two that were within that five years that were still pending. So it depends on how you read the phrase or been involved in. It sounds like a Lewinsky question or semantics. You know, I looked up each of you, and I realized that you were appointed by President Clinton, and I was going out of my way to avoid the meaning of his. But since you raised it. And if you've read any of our jurisprudence, you can see that you can't learn very much. But if I could talk about that. First of all, on an application for insurance, any ambiguity is going to go to the insurer. We cited you, the American Mutual case. Yeah, but it doesn't sound very ambiguous to me is my problem. Involved in, if you've got a pending claim that hasn't been settled within the five-year period, it sounds like I'm involved in it. It doesn't say pending, Your Honor. It says been involved in. Does that mean commenced or does that mean continuing? Those are two. Could mean two. It could mean, and if it could mean both, it's ambiguous. Counselor, how many times do lawyers say I'm involved in a big case right now, and it means that you're spending some or a large amount of your time working on the case? Certainly lawyers say that. But we're in a different situation here. We're with the insurance company writing the words, write them clearly. And they have lawyers who help them write these sorts of things, don't they? Last time I looked, they did. Embarrassingly so, yes. So some lawyer wrote a bad question. Indeed, and having done that, the answer is by this year, if involved, been involved in, not am involved in, not I'm having a drink and I'm telling somebody I've got to go argue to the Ninth Circuit, I've got to tell them that would be the still going on. Been involved in is also capable of when was it commenced. Finally here, because I see I have 546, I want to say a word about latches, or more than a word. We understand that Civil Code 1693 has tended to defang Civil Code 1691 on the issue of undue delay. But undue delay remains a central feature of latches. And this case is interesting in that Admiral says the first time we had any knowledge about any of this stuff is when we got the Atkinson complaint in May of 2004. But they don't file the rescission action until February 22, 2005, until the insured March 1, 2005. More critical than that, in the excerpt of record, tab 25, 1671, and pardon me, I said that wrong, 1617, 1618, you will find documents dated August 5, 2004, in which Admiral made the decision to rescind. Check the box. We're going to rescind. Mr. Kelly, you say you do a lot of insurance defense work. Isn't that the whole purpose for a reservation of rights? Basically the insurer is putting the insured on notice. And that happened within four days of the tender of the claim. Doesn't that put the insured on notice that it may have a coverage dispute with its carrier that it's going to have to worry about in the future? That is clearly the intent. I don't have numbers on this, and I don't know where you get them. But I am confident that if you looked at the number of reservation of rights letters issued and the number of rescission actions that resulted, you're talking a very, very small percentage. Reservation of rights letters are uniformly issued by insurers to protect their rights, to be sure. Including the right to rescind. Including the right to rescind. Most of them deny coverage because this particular conduct doesn't fall within occurrence under the policy or whatever. That's correct. But if you are an insured and you get that and you go to your lawyer and say, what does this mean, the lawyer would tell you absolutely correctly, most of the time it doesn't mean much. Insurers do this, but they very rarely deny coverage or issue rescissions. You also tell your client you better watch your back because of the fact that the insurer is telling you here you may be left hanging high and dry down the road. Since I work the other side, it's hard to know, but from my friends on the plaintiff bar, I think that they would proceed with the assumption that the insurance company is not going to walk away from coverage. Assume for the moment that we agree with you that there was insufficient warning, although I confess I'm likely to go the other way on that. I'm having trouble with that one, I can see. Let's look at the harm. The harm alleged is the detrimental reliance alleged is you hired a high-class law firm and paid more money. You wanted to hire a cheap one instead if it had been up to you. I got that right? That's certainly part of it. The harm is more than that. Rather than immediately pursuing how can we get rid of this action, what's the cheapest way to get rid of this action? The conclusion of DCC was we're going to fight this on the beaches, on the streets. We're going to go at it. We got our rel in Manila, and we are going to the mat. And following that strategy, I mean, all defendants in a perfect world would hire the best lawyers and present all their claims, but economics entered the feature. And had the insured believed, I had you told him in August. I mean, that's only three months. I had you said in August, you know, we've reached the firm conclusion that we're going to dump you. You lied to us and we're going to rescind. You take a different course. And here's the real problem with the district court's decision. The district court says, well, the declaration, Mr. Devers' declaration, bald assertions. There are two problems with that. First, it happened. What he said is true. When I found out they were serious about going forward, I said goodbye to our rel in Manila and hired cheaper counsel. And second, it's a summary judgment motion. It's not the trial. The judge weighed the evidence in reaching that conclusion, and that was inappropriate. I see I have 49 seconds left for rebuttal, and I thank you. May it please the Court. Good morning. I'm Robert Hoffman, counsel for Admiral Insurance Company. I just want to reiterate some of the points that have been just addressed, in that this policy that we're discussing is an employment practices liability policy. Admiral had no prior dealings with data control before they received this initial application. One of the primary things that an insurer wants to obtain from a new applicant is their claims history. The sexual harassment and retaliation claims that were never disclosed on either application involved the CEO and president of a small company. This is not a situation where it's a low-level employee. This is the founder of the company being alleged to be a serial harasser. This is something that is material to the evaluation of the risk that is undertaken by the insurer, particularly with respect to a new applicant. At no time was there ever any disclosure to Admiral or its underwriting agent, which is Monitor Liability Managers, Inc. Monitor is the agent that issues the policies, that signs the policies, that handles the entire underwriting process for Admiral. And they were never advised of any of these lawsuits until after the second policy was issued and the Altman claim is filed, which attaches as exhibits three complaints. Mr. Hoffman, if this is such a critical part of the underwriting analysis, why doesn't Admiral just ask a straightforward question of its potential insurer to elicit claims history? Your Honor, there are two questions that are asked in the claims section. I read the questions, but I think you have to agree with me they are not a model of clarity. Well, I think that there can be other ways of saying things, but the bottom line is they're trying to find out has there been any prior claims. Well, I understand the intent. I'm just asking you why couldn't you just phrase the question in a way that simply asks, in the last five years have any claims been filed? Are there any claims that are currently pending? Do you know of any threatened claims that have not yet been filed from either current or former employees? But trying to get all that in the way that those two questions are phrased, it doesn't really say that clearly. Well, Your Honor, I would submit that the applications do request are claims made. And one of the issues here is dealing with the employment context. It's not always lawsuit. You could have a complaint to the Fair Employment Housing Department. You could have some type of oral complaints that are made to the employer, and they're very vigilant, most employers, about making sure that they address these types of complaints. So the purpose of the application, whether it's the 2002 application or the 2003, has two parts to it. There's two components. One component is, has there been a claim made? And it's defined to be a claim that does not necessarily involve a lawsuit. The second aspect. I mean, you know, we see a lot of employment discrimination cases. We know how they get initiated. All I'm asking is, isn't it incumbent upon the insurer, if that's the information that it's looking for, to at least frame a simple question in a way that a layperson who's trying to apply for the insurance can understand what you're asking for? I would respectfully submit that this is a situation where the questions are understandable to the layperson, that they're asking, has a claim been made? Are you involved in a claim? And under either of those questions, the intent is to ferret out claims. Because there may be a situation where a claim is made, but it's no longer pending, and the insurance company wants to know the details. And there's a box below these questions on the application that quite clearly specifies that a claim supplement form has to be filed, irrespective of whether the matter has been settled or not, which is further evidence of the fact that the insurance company is seeking claims information. The actual application itself expressly states that the insured agrees that the application will be a part of the insurance policy. Condition Section 8.B of the policy also notes that the proposal form is part of the policy. The California Supreme Court, beginning in 1990, has stated that the ordinary and popular sense of the words of an insurance policy, as in any other contract, are to be viewed in the context of the entirety of the document. So I would respectfully submit that in looking at that application, which is for employment practices coverage, that a disclosure under the heading claim and litigation history would require the disclosure of two lawsuits against the CEO of the new applicant, or on the renewal in 2003, to disclose that they were still involved in litigation within the five-year period. Let me ask you this. I understand exactly why the insurance company wants this information. What I don't understand is why the insurance company dilly-dallied. Well, one of the issues was that this litigation is in Nevada County Superior Court. And so it turned out, as the insurance company began to investigate, they learned of all these other actions involving DCC and Mr. Deber. There were suits against the attorneys for one of the claimants. There were suits against another employee. There were cross-suits. They investigated those matters and wanted to be complete and thorough before they initiated litigation. And why did they dilly-dally after the issuance of the binder? I mean, delay, delay, delay. What's going on? Okay. With respect to the binder, one thing that has been omitted from the briefs and during our argument today is that on March 12, 2003, tab 29, document 1806, monitor, request Sweatt & Crawford, the surplus lines broker, to advise them what's the status on the question number 6 of the application regarding changes in senior management. That was in March, within two weeks of the receipt of that policy. And it's not until June 10, 2003, that Sweatt & Crawford says, well, what happened to our policy? And that very next day on June 11, the insurance company says, we still are waiting for you to provide us with that information. And Sweatt & Crawford is a surplus lines broker. Admiral cannot just call the insured or call a retail broker. They have to go through the surplus lines broker. And I do want to advise the Court that there has been a development in this case in that Data Control Corporation has filed a lawsuit in Los Angeles County Superior Court against both surplus lines brokers, both retail brokers for the 2002 and 2003 policies. And in that lawsuit, they expressly allege negligence in breach of contract, stating that you, the brokers, never told Admiral about these claims, and you failed to advise us to disclose those claims to Admiral. Okay, so they've got a malpractice action against their broker. But, I mean, what does that have to do with the issues that are before us? The question is whether or not you asked a clear question, whether the insured had an obligation to honestly answer it, and then you still haven't answered Judge Fletcher's question about what took so long. Okay, so it took a while to root through the Nevada County files, but you decided in August that you were going to rescind, but you didn't give formal announcement for, what, six or seven months after that? How come? Well, it was from August, I guess, was the decision made, and then there was further investigation, then counsel was retained, and then a lawsuit was filed on February 22, 2005. And going back to Civil Code Section 1693, the issue of substantial prejudice is the test in terms of if there's any claim delay. I would submit that the reservation of rights letter within four days of the issuance. Yeah, but that's not the question that was asked. The question is why the delay. You're asking the consequence. You're answering the consequences of. We're asking why. Okay, my understanding is that there was investigation in Nevada County that it took time to ascertain what the status of the litigation was. And when did that investigation take place? My understanding is it took place sometime before August 5 when the company had that meeting, but there was further investigation after that to ascertain about the status of the appeals involving the underlying litigation that went up on appeal to Sacramento. But by the time you have that August checking the box, you have enough information that allows you to rescind, correct? That is correct. At that time, there was a decision. Why don't you indicate right then, well, hey, listen, we can rescind and we're doing it. Well, I think at that point in time, they wanted to be certain that they had everything they needed for litigation. I mean, just because a committee says we're going to go ahead with that, that's a whole other expense, it's a whole other endeavor, and they wanted to further investigate. They eventually hired counsel to look into it, make recommendations, and go forward with the suit, which was done. And we would submit that in the context of the claims handling that was going on, that is not an unreasonable period of time. And the McDevitt case examined a one-year delay and said that was not laches. So I think I heard you say, and we'll ask it directly, are you arguing to us that when an insurer decides that it is going to rescind, it needs to determine what the status is of the underlying litigation before it pulls the rug out from under the insurer, because you don't want to increase the potential damages that you might cause if a court later says you wrongfully rescinded? No, I'm not submitting that, Your Honor. What I'm submitting is that the insurance company wanted to be thorough. They wanted to make sure they had all the information involving what was happening in the litigation, and this litigation was taking place across multiple fronts with multiple claims, or at least four different. But doesn't the insurance company have to ask itself, if we tell the insurer that we're rescinding, and we do so, and we stop paying IRL in Manila, and we disclaim any responsibility for paying a judgment or settlement in this case, doesn't the insurer have to be worried about down the road a bad faith claim and what the damages might be if the former insured wins its bad faith claim because the rescission was improper? Your Honor, I would submit that the reservation of rights on May 28, 2004, clearly stated in a two-page document the right to rescind. So the insurer was on notice. I also want to state factually on March 17, 2004, IRL in Manila was hired by data control. I understand. For some reason, you and I are just like two ships passing in the night here. I want to direct your attention to what was going through Admiral's mind in August of 2004. On August 5, apparently, the decision was made, we're going to rescind. We were lied to. Wouldn't the insurer want to know before it tells the insured we're rescinding what the status is of the litigation and then assess what the risks to the insurer might be if it rescinds? Because if it's subsequently determined that that rescission decision was wrong, the insurer has now opened itself up to potential liability that may very well exceed the limits of its policy. Am I wrong? Do I not understand insurance? No, what happened here was a different scenario in that not only was there a reservation of rights. Before we get to what happened here, just tell me if I understand insurance practice. Well, that's why I'm trying to tie it in is that there was a defense. This wasn't a situation where the insurer said, you know what, we're going to rescind and we're going to cut you loose. See you later. You're on your own. The entire action was defended. All the attorney's fees were paid that were billed by IRL at the panel rates. The entire settlement amount that was requested by data control was funded under a reservation of rights. So there was a prophylactic effort by the insurance company to say we have our coverage position, but we're going to provide the coverage that we initially agreed to do under the reservation of rights, which is what the Supreme Court has advocated insurance companies to do to protect the interest of the insured, take them out of harm's way of the plaintiff, and then seek the relief on the rescission. And it was filed in February, and I understand the court saying that there's a period of time between August and February. All I can say is that it's my understanding that the insurance company was following up even after the August meeting and eventually hired counsel. But in the interim time period, it was doing everything it was being asked to do in terms of defending the claim and settling the claim and then adjudicating the result before the district court. So your answer to our question, there are no damages here, because there was no change in the duties and responsibilities of the insurer who continued to fund the litigation throughout the entire time period. Now we're just fighting over whether we get the money back. I would say that that's a fair statement in the sense that the insurance company defended the claim with the counsel chosen by the insurer, settled the claim in the amount requested by the insurer, had that case dismissed, and then proceeded to litigate its rights under the policy for the Federal to disclose. If this was a scenario, as the district court noted, when the insurance company did not defend, did not reserve rights, that's the context of a bad faith exposure you're talking about. But here, the insurance company took the view, we're going to go every step of the way and do what is asked. When Arella Manella says they want to have two lawyers, they're given two lawyers. When they want to interview witnesses, they're paid to do that. When their counsel, the new counsel Dempsey and Johnson says $350,000 is what we want you to authorize, they authorize it immediately. They cut the check on September 26, 2004, and send that out to the plaintiff's counsel directly. So they did everything asked for them. They never once said, we're going to stop defending you. And they maybe had the opportunity to do that, but they didn't do that. They chose to defend under the reservation and litigate at a later point in time. Help me with the timeline here. At what point does the, your, I don't want to call it the insured, but your non-insured, your would-be insured, move from Arella Manella to the other law firm? And what triggers that move? Their move, I believe they had, initially there was a request made to Arella Manella March 1st to agree to rescind. And the premium was tendered. On April, the first week of April, I believe it was around April 7th, that tender was rejected. Then there was a follow-up request by counsel for Admiral to have them sign the notice of acknowledgement of receipt for the service of the summons to avoid the expense of personally serving all these defendants who were insured. It was approximately the first week in May that notice was given that Arella Manella was no longer going to be counsel and that this other firm, Dempsey & Johnson, would be substituting in as counsel of record in the underlying action, which I believe was done. And as of June of that year, there had been no discovery taken. And even as far as August, in the reports provided by the Dempsey firm, there was no depositions, no discovery. And I want to also note with respect to this argument under Lachey's, on June 8th, 2004, there was a letter sent by Arella Manella to Monitor, the agent for Admiral, which expressly stated that they were trying to get an immediate settlement and an immediate mediation. And that was their strategy from the get-go. And if you look at the actual billing statements, which we provided in the record from March 17th, 2004, up through and including May 24th, 2004, when the matter was first tendered to Admiral, there's all types of strategy discussions and meetings amongst the lawyers for Arella and Mr. Devere talking about we're going to remove this to federal court, we're going to compel arbitration, we're going to have mediation discussions. All of that predates the tender of the lawsuit. So I would respond that it's not accurate to say that Admiral was the driving force about what strategies were to be implemented. Sotomayor There's something in the brief that suggests that the insured was willing to pay more to Arella Manella if the insurance company would only pay up to a certain amount. Is there something to that? Goldstein Your Honor, the way it works is that under Civil Code Section 2860, you have independent counsel appointed as a result of an insurance company reserving rights. Then under that code section, 2860 subsection C, the insurer is only obligated to pay what in the industry is called panel rates, but which in the statute is the amount of fees that are actually paid in the community where the claim arose or is being defended. So those panel rates, they gave the highest possible panel rates to Arella Manella, which is not going to be their actual billing rates. That's all they would pay no matter what counsel would be employed, which kind of raises the question, why would you continue with the highest paid firm to begin with if you knew that the panel rates were going to be X? And instead, when they went to change counsel, the same scenario. They were still much above the panel rates, but by code in California, the insurance company is only obligated to pay those actual panel rates. So even the second firm was charging above panel rates? Yes, significantly above panel rates. And one last point. These are LA firms that are basically held to Nevada County rates? Is that it? Well, they paid the higher rate of the Sacramento area, I believe, as one of the factors that was examined. And so it was, I believe, $225 an hour, which a lot of these panel rates, they're firms that are very good firms, but they do a lot of work for the insurance companies, so they have certain rates that have been negotiated. And just one last point, because my time is coming up, is that at no time can it be said that the surplus lines brokers were the agents of Admiral. And that's an important point that we addressed in our brief. Thank you, Your Honor. Thank you very much. Mr. Keller, you've saved 45 seconds. Actually, it says 42, but we'll give you three. No, don't let me tease. You say what you need to say. Well, I need to get going. I want to start with Judge Taubman's question about couldn't you just say, are there any currently pending claims? And, yes, of course, you could say that. But what I would ask you to take a look at in the record is the declaration of Karen Branson. Karen Branson was a lady at Plasser. Plasser is the first company involved in placing the second Admiral policy. She gets questions about, hey, should we disclose this stuff to, you know, when we're looking at this question 12, been involved in all this stuff, should we disclose that? Well, she finds out about all the litigation, and she goes to the next in line. She goes to F.C. Morgan, and you'll find this in paragraphs 11 and 12 of her declaration, and says, hey, here's the tale. Do you need to disclose this? And they look at the thing and they say, nah, it's more than five years. You don't need to disclose it. What's the relevancy of that? The relevancy is this. If you want a demonstration that it's an ambiguous question, and here you have two people in the business of insurance placing a risk, the worst thing they could do is screw this up, so they now end up in court in Los Angeles, and their conclusion was that they didn't need to respond. Are these questions unclear? You bet. But the question is, during the last five years, has the insurance entity been involved in any lawsuit, dot, dot, dot? Well, during that last five-year period, you've got two pending lawsuits. How can you say that you have not been involved? You've got two lawsuits that were commenced more than five years ago that two insurance brokers thought you didn't have to disclose. And ongoing during the five-year period. That's absolutely true. If you read it that way, you know, I need to go home. I understand that. Before you sit down, let me ask you, didn't Mr. Deber admit on deposition, and he is a former insurance agent, that he thought that the answer to that question was wrong? He screwed up, he said, in the first policy application, not this policy application for the policy that was invoked by the Altman claim. His answer only goes to the initial one. All right. One other point. We're at one minute and 45 seconds over. Let's have a minute to wrap up. You ask about what's going on from April 5th on, and you got an answer. It's a pretty good excerpt of record, but I think you can read it from end to end, and you won't find any hint as to what Admiral was doing from April 5th on. I couldn't find it. I mean, I assume they're just watching the game. August 5th on? I'm sorry. I mean, do you mean August 5th on? And why they delayed, and the theory that there was no damage? The answer for Mr. Deber's declaration is he found out on March 1st, 2005, that the rug's going to be pulled out, and April 27th, he changed his counsel. Suppose they told him on August 5th the rug is going. Might have changed counsel within a month or two thereafter. So the two elements, undue delay and harm, are present, and I thank you for listening to me. Okay. Thank both sides for a very good argument. The case of Admiral Insurance Company v. J. Deber et al. is now submitted for decision, and we are in adjournment until tomorrow morning. Thank you very much. Thank you.
judges: Fletcher, Tallman, Dawson